

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 13, 2020

**BY ECF**

The Honorable Paul A. Crotty
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re: *United States v. Rashaun McKay*, 18 Cr. 339 (PAC)**

Dear Judge Crotty:

Defendant Rashaun McKay is scheduled to be sentenced on January 22, 2020, at 4:30 p.m. The Government respectfully submits this letter in connection with sentencing. For the reasons set forth below, the Court should impose a sentence within the Stipulated Guidelines Range of 51 to 57 months' imprisonment.

## I. Offense Conduct

McKay and his co-conspirators participated in a wide-ranging scheme (the "Fraud Scheme") that involved unlawfully obtaining personally identifiable information of other individuals (including names, addresses, phone numbers, email addresses, birthdates, Social Security numbers, bank account numbers, credit and debit card numbers, and cellphone service provider account numbers); impersonating those individuals in order to obtain unauthorized access to their bank, credit and debit card, and cellphone service provider accounts; using such access to, among other things, facilitate the fraudulent transfer of funds to other bank accounts controlled by members of the conspiracy and the unauthorized purchasing of merchandise and gift cards at retail stores. In total, members of the conspiracy unlawfully obtained more than $3,500,000 and attempted to obtain a total of more than $6,000,000.

To carry out the Fraud Scheme, members of the conspiracy obtained victims' personally identifiable information from various sources, including the dark web and commercial establishments at which members of the scheme worked. For example, one of McKay's co-defendants, Jillian Walcott, stole victims' personally identifiable information from an urgent care walk-in medical clinic in Manhattan where she worked. After obtaining a victim's personally identifiable information, conspirators typically manufactured fraudulent credit or debit cards linked to victims' accounts at financial institutions in order to access those accounts to make fraudulent purchases or wire transfers.

In some cases, members of the conspiracy attempted to "port"[1] (i.e., transfer) a victim's telephone number to a cellphone controlled by a Fraud Scheme participant. Once the victims' telephone numbers were "ported" to cellphones controlled by Fraud Scheme participants, the Fraud Scheme participants would place telephone calls from those cellphones (to which the recently ported numbers were assigned) to the victims' financial institutions. In most cases, the relevant financial institution's telephone system automatically recognized the incoming telephone numbers as belonging to their account holders and, on that basis, required fewer pieces of identifying information to authenticate the identity of the callers. The defendants and/or their co-conspirators answered the limited set of authentication questions posed by the financial institution's customer service representative and then requested that (a) funds be sent via wire transfer to various accounts with other financial institutions and/or (b) "replacement" credit cards be sent to an address not associated with the account holder. In other cases, Fraud Scheme participants used the "ported" cellphones to approve fraudulent purchases when a victim's financial institution texted or called a victim's telephone number to verify the propriety of the fraudulent purchases.

McKay was a core member of the Fraud Scheme, whose role included purchasing merchandise at retailers using fraudulent credit cards. (PSR ¶ 31.) The following are some examples of McKay's participation in the Fraud Scheme:

- At approximately 3:35 p.m. on or about March 20, 2017, co-defendant Jamal Simon placed a telephone call to McKay. During that call, the following conversation occurred:

| | |
|---|---|
| SIMON | "That shit's dead." |
| McKAY | "Damn, son." |
| SIMON | "They said somebody called in and reported it stolen." |
| McKAY | "Oh, word." |
| SIMON | "Yeah. I'm gonna get it back though. I'm gonna send for that shit again, bro." |
| McKAY | "Alright." |

The following morning, Simon placed a call to a credit card issuer ("Card Issuer-1"). During that call, Simon impersonated a victim ("Victim-1"), and provided to Card Issuer-1 Victim-1's telephone number and account PIN. Simon also requested that a replacement credit card be issued for Victim-1 and that it be sent to a particular address in Brooklyn, New York, that was controlled by co-

[1] "Porting" refers to a formal technical process whereby an existing telephone number is reassigned to a different cellphone. Initiating the porting process without authorization of the owner of the cellphone number is a critical aspect of the scheme described herein, because credit card issuers often contact their customers via the cellphone number on file when the issuer detects suspicious activity on a customer's account. If a member of the scheme has control of the cellphone number, then that member can falsely confirm the propriety of fraudulent transactions.

defendant Darren Davidson. Davidson subsequently received the replacement credit card and provided it to Simon.

- At approximately 6:23 p.m. on or about March 22, 2017, Simon placed a telephone call to a cellphone device insurance company ("Cellphone Insurer-1"). During that call, Simon impersonated Victim-1, and provided to Cellphone Insurer-1 Victim-1's cellphone number and the last four digits of Victim-1's Social Security number. Simon requested that a new cellphone and a SIM card be activated with Victim-1's telephone number. The customer service representative for Cellphone Insurer-1 told Simon that the SIM card was not eligible for activation.

  At approximately 6:29 p.m. on or about March 22, 2017, Simon placed a telephone call to McKay. During that call, Simon told McKay that "n---- said the SIM card I got is no good. I gotta get new ones." McKay responded, "Alright." Simon continued, "I probably gotta go, um, I gotta go to Best Buy so gimme like two minutes."

  At approximately 6:59 p.m. on or about March 22, 2017, Simon placed a telephone call to Cellphone Insurer-1. During that call, Simon impersonated Victim-1, and provided to Cellphone Insurer-1 Victim-1's cellphone number and the last four digits of Victim-1's passcode number. Simon requested a new cellphone and SIM card be activated with Victim-1's telephone number.

  At approximately 7:16 p.m. on or about March 22, 2017, Simon placed a telephone call to McKay. During that call, Simon asked McKay, "they got shit?" McKay responded, "I got the last two Pads[ ] and they got one more PlayStation." Simon then asked, "they ringing you up yet?" McKay replied, "yeah, right now."

- At approximately 6:32 p.m. on or about March 23, 2017, Simon placed a telephone call to McKay. Simon asked McKay whether "they got shit in there?" McKay responded, "they got like two, four, five pros. I'm about to get two pros. They gonna have three left. And they got PlayStations." Simon and McKay also discussed the "moves" of the loss prevention staff at the retailer where McKay was purchasing electronics.

  At approximately 6:45 p.m. on or about March 23, 2017, Simon placed a telephone call to McKay. Simon asked McKay, "it went?" McKay responded, "yeah." Simon then exclaimed, "booyah!"

  Between approximately 6:30 p.m. and approximately 6:45 p.m., on or about March 23, 2017, McKay was present at a checkout counter inside a retailer's location in Brooklyn, New York.

- At approximately 8:55 p.m. on or about March 23, 2017, Simon placed a telephone call to McKay. During that call, Simon and McKay discussed purchases of electronics McKay was making contemporaneously at an electronics retailer and

whether purchases in excess of $800 would need to be processed as separate transactions.

- From approximately 12:43 p.m. to approximately 1:57 p.m. on or about April 6, 2017, Simon placed telephone calls to, among others, McKay. The apparent purpose of these calls was to plan unauthorized purchases of merchandise with a particular counterfeit credit card ("Counterfeit CC-1").

- Between approximately 3:12 p.m. and approximately 3:21 p.m. on or about April 6, 2017, McKay was present at a checkout counter inside one of a retailer's locations in Brooklyn, New York. At approximately 3:12 p.m. on or about April 6, 2017, at that retail location, McKay attempted to make a $2,000 unauthorized charge to a victim's ("Victim-3") account with Card Issuer-1, but the charge was declined.

  At approximately 3:14 p.m. on or about April 6, 2017, Simon placed a call to McKay, and directed McKay to "push the same $2,000," meaning that McKay should again use Counterfeit CC-1 to make an attempted unauthorized purchase of merchandise in the amount of $2,000.

  At approximately 3:17 p.m. on or about April 6, 2017, McKay again attempted to make a $2,000 unauthorized charge to Victim-3's account with Card Issuer-1, and the charge was approved. At approximately 3:21 p.m. on or about April 6, 2017, McKay attempted to make an approximately $4,025 unauthorized charge to Victim-3's account with Card Issuer-1, and the charge was approved.

## II. Procedural History

On May 14, 2018, McKay was charged in Indictment 18 Cr. 339 (PAC) (the "Indictment") with conspiracy to commit access device fraud, in violation of Title 18, United States Code, Section 1029(b)(2) (Count One); conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349 (Count Two); and aggravated identity theft, in violation of Title 18, United States Code, Section 1028A (Count Three). (PSR ¶¶ 1-4.) On August 26, 2019, McKay pled guilty to Counts Two and Three of the Indictment pursuant to a plea agreement. (PSR ¶ 8.) In the plea agreement, the parties stipulated that the offense level for Count Two is 16, that the McKay's Criminal History Category is III, and that the Guidelines Range for Count Two is 27 to 33 months' imprisonment, to be followed by a mandatory two-year consecutive term of imprisonment on Count Three. (PSR ¶ 9.) The Probation Office reached the same conclusion with respect to the offense level calculation (PSR ¶¶ 59-72), but determined that McKay is in Criminal History Category IV (PSR ¶¶ 74-79). Accordingly, the Probation Office calculated an applicable Guidelines range of 33 to 41 months' imprisonment on Count Two, to be followed by a mandatory two-year consecutive term of imprisonment on Count Three (for an effective Guidelines range of 57 to 65 months' imprisonment). (PSR ¶ 103.) The Probation Office recommended that the Court impose a sentence of 57 months' imprisonment (PSR at 24).

## III. Sentences Imposed on Co-Defendants

To assist the Court in assessing the relative culpability of the defendants, the Government provides the following chart of the defendants who have pled guilty in this case, listed in the order of their applicable Guidelines ranges (from highest to lowest):

| Defendant | Criminal History Category | Criminal Offenses | Mandatory Minimum (months) | Guidelines Range (months) | Sentence of Imprisonment (months) |
|---|---|---|---|---|---|
| Jamal Simon | I | wire fraud conspiracy; aggravated identity theft; wrongfully obtaining individually identifiable health information | 24 | 121 to 155 | |
| Melvin Brown | IV | wire fraud conspiracy; aggravated identity theft | 24 | 65 to 75 | |
| David Boyd | IV | wire fraud conspiracy; aggravated identity theft | 24 | 51 to 57 | 51 |
| Rashaun McKay | III | wire fraud conspiracy; aggravated identity theft | 24 | 51 to 57 | |
| Dawdu Marriott | II | wire fraud conspiracy; aggravated identity theft | 24 | 39 to 45 | 40 |
| Dwayne Norville | IV | wire fraud conspiracy | 0 | 33 to 41 | 28 |
| Jillian Walcott | I | wire fraud conspiracy; wrongfully obtaining individually identifiable health information | 0 | 33 to 41 | |

| Defendant | Criminal History Category | Criminal Offenses | Mandatory Minimum (months) | Guidelines Range (months) | Sentence of Imprisonment (months) |
|---|---|---|---|---|---|
| Megan Montoya | III | wire fraud conspiracy | 0 | 33 to 41 | Time Served (83 days) |
| Darren Davidson | I | wire fraud conspiracy | 0 | 27 to 33 | 24 |
| Yvette Lubrun | I | wire fraud conspiracy | 0 | 15 to 21 | Probation |

## IV. Discussion

### A. Applicable Law

Although *United States v. Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. 220, 264 (2005). As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B. A Sentence Within the Stipulated Guidelines Range Is Appropriate In This Case

The 18 U.S.C. § 3553(a) factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to afford adequate deterrence to this defendant and others who are similarly situated, to promote respect for the law, and to protect the

public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(A)-(C). These considerations weigh in favor of a sentence within the Stipulated Guidelines Range of 51 to 57 months' imprisonment.

*First*, a sentence within the Stipulated Guidelines Range would appropriately reflect the nature and seriousness of McKay's conduct. McKay played an important role in the Fraud Scheme, using counterfeit and stolen credit cards to make or attempt to make fraudulent purchases of merchandise from retail stores that caused or attempted to cause between $150,000 and $250,000 in losses to victims. (PSR ¶ 52.) Overall, the Fraud Scheme caused losses of more than $3.5 million to victims and attempted to scam millions more.

*Second*, a sentence within the Stipulated Guidelines Range is necessary to promote respect for the law and to deter others who are similarly situated from participating in similar schemes. Fraud schemes of this type are on the rise because the unscrupulous have found that identity theft is profitable and easy to implement and conceal from law enforcement. Following the nominal investment in obtaining individually identifiable information and blank cards with magnetic strips, the crime carries no further financial cost, apart from the prospect of apprehension and criminal penalties. However, the likelihood of detection is substantially lower than many other theft offenses. Victims often do not realize that have been victimized for some period and are not able to report the fraud until well after funds have been stolen from their accounts and they have been substantially harmed. In addition, the investigation of cases such as these is extraordinarily resource-intensive for law enforcement, and requires a substantial investment of resources in order to reveal the activities of a scheme such as this and the identities of its members. Substantial punishment is required to counterbalance the general perception that this type of scheme carries low costs for perpetrators.

*Third*, a sentence within the Stipulated Guidelines Range is needed to deter this defendant from committing additional crimes and to protect the public. The defendant's criminal history is serious:

- In 1999, McKay and several other males forcibly sodomized a 12-year-old female victim. (PSR ¶ 74.) In particular, McKay forcibly placed his penis in the victim's mouth. (PSR ¶ 74.) At the time, McKay was affiliated with the Bloods gang. (PSR ¶ 74.) McKay was given a lenient punishment—he initially was sentenced to six months' imprisonment and five years' probation, and three years later he was resentenced to one year of imprisonment. (PSR ¶ 74.) As a result of this conviction, McKay is a Level 2 sex offender, and has a lifetime registry with the New York Sex Offender Registry. (PSR ¶ 74.)

- In 2008, McKay was observed by police officers smoking a lit marijuana cigarette. (PSR ¶ 75.) When McKay was approached by one of the officers, McKay put the marijuana cigarette in his mouth and swallowed it. (PSR ¶ 75.) When officers began to place McKay under arrest, he attempted to evade arrest by flailing his arms and encouraged others to interfere with the arrest by shouting "Cops are harassing me, come out and help me!" (PSR ¶ 74.) After his arrest, McKay was found to be in possession of 19 small plastic bags of crack cocaine—packaged for sale, in a

quantity that suggests McKay was selling crack at that time—and a plastic bag of marijuana. (PSR ¶ 75.) McKay was given a lenient sentence of 30 days' imprisonment. (PSR ¶ 75.)

- In 2016, McKay was arrested after law enforcement agents found him in possession of, among other things, several identification documents bearing his photographs and other individuals' names, 65 counterfeit and stolen credit cards, credit card skimmers, and a credit card embossing machine. (PSR ¶ 76.) McKay again was afforded leniency, and was sentenced to three years of probation. (PSR ¶ 76.)

McKay's pattern of criminal conduct is alarming. McKay was shown unwarranted leniency after each prior conviction and squandered second and third chances by reoffending. Specifically, in his prior federal case, McKay claimed that he had "faced his poor decision making and actions and accepted responsibility for his part" in a similar fraud scheme. (Def. Sentencing Ltr. 2, *United States v. McKay*, 16 Cr. 158 (LDH) (E.D.N.Y. Mar. 29, 2017), ECF No. 27 ("Def. EDNY Ltr.").) He claimed that, while on pretrial release, he had "taken advantage of opportunities to lessen his financial stress by pursuing a lifestyle that fosters job attainment. (Def. EDNY Ltr. 2.) He purportedly had "decided his best chance at lawfully contributing to his family would be to develop a trade." (Def. EDNY Ltr. 2.) He touted those alleged achievements as "show[ing] that he would be a good candidate for leniency in the form of a sentence of probation and that he understands the need to make a change." (Def. EDNY Ltr. 2.) However, as set forth above, McKay's criminal conduct in this case was occurring literally the same week and the week following his sentencing submission in his prior federal fraud case. McKay's misrepresentations appear to have been successful; in that case, he was sentenced only to probation. (PSR ¶ 76.)

Unfortunately, none of McKay's prior experiences with the criminal justice system appear to have had any deterrent effect on McKay at all. The Court should sentence McKay to a term of imprisonment within the Stipulated Guidelines Range to ensure that the defendant is adequately deterred and to protect the public from his crimes for a meaningful period.

In sum, a sentence within the Guidelines Range adequately would balance the various considerations under § 3553(a) and achieve the statute's stated objectives.

**V. Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence on McKay within the Guidelines Range of 51 to 57 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: Robert B. Sobelman
Nicholas W. Chiuchiolo
Robert B. Sobelman
Assistant United States Attorneys
(212) 637-1247/2616

Cc: Stephen Turano, Esq. (by ECF)